UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL WOLLSCHLAGER,

        Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION,

        Defendant.
_____/

Case No. 19-10505
HON. VICTORIA A. ROBERTS

## ORDER GRANTING DEFENDANT FDIC'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [ECF No. 22] AND DENYING PLAINTIFF'S MEMORANDUM BRIEF FOR REVIEW OF FDIC DECISION [ECF No. 21]

### I.   INTRODUCTION

Before the Court are the parties' cross motions seeking judicial review of the Federal Deposit Insurance Corporation's ("FDIC") decision to deny Daniel Wollschlager ("Wollschlager") a second golden parachute payment in connection with his prior employment with The State Bank. [ECF Nos. 21, 22].

The FDIC was permitted as a matter of law to deny Wollschlager a second golden parachute payment. Accordingly, the Court **GRANTS** the FDIC's Motion for Judgment on the Administrative Record [ECF No. 22] and

1

**DENIES** Wollschlager's Memorandum Brief for Review of the FDIC's Decision [ECF No. 21].

## II.   STATUTORY AND REGULATORY BACKGROUND

The Federal Deposit Insurance Act authorizes the FDIC to prescribe regulations pertaining to insured depository institutions. *See* 12 U.S.C. § 1828. Relevant to this case, the FDIC "may prohibit or limit, by regulation or order, any golden parachute payment …" *Id.* at § 1828(k). A golden parachute payment is:

> any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or covered company for the benefit of any institution-affiliated party ("IAP") pursuant to an obligation of such institution or covered company that[:] (i) is contingent on the termination of such party's affiliation with the institution or covered company; and (ii) is received on or after the date on which … the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition.

*Id.* at § 1828(k)(4). A payment that is "contingent on, or by its terms is payable on or after, the termination of" primary employment or affiliation with the institution or holding company is a golden parachute payment. 12 C.F.R. § 359.1(f).

Before a bank can make an otherwise prohibited golden parachute payment to an IAP, the FDIC must review and approve an application by the

bank or the IAP. See 12 C.F.R. §§ 359.4(a)(1), (3) ("An insured depository institution or depository institution holding company may agree to make or may make a golden parachute payment if and to the extent that … [t]he appropriate federal banking agency, with the written concurrence of the [FDIC], determines that such a payment or agreement is permissible…"). The FDIC generally prohibits banks from making golden parachute payments unless the bank first obtains approval from the appropriate federal banking agency, with the concurrence of the FDIC. 12 C.F.R. §§ 359.4(a)(1), (3).

### III.   FACTUAL BACKGROUND

Wollschlager began working for The State Bank ("the Bank") in October 2008. In connection with that employment, Wollschlager entered into a Supplemental Executive Retirement Agreement ("SERP Agreement") with the Bank's holding company, Fentura Financial, Inc., ("Fentura"), effective October 24, 2008. Under the terms of this agreement, Wollschlager was eligible to receive a $175,000 lump sum payment if the Bank terminated him without cause.

The FDIC designated the Bank to be in "troubled condition" in June 2009. As a result, the Bank entered into a Consent Order with the FDIC and the state regulator that required it to take corrective actions. Fentura entered

into a corrective action written agreement also, with the Federal Reserve System ("FRB"), effective November 4, 2010. The FRB classified Fentura to be in "troubled condition" in June 2011.

On December 21, 2010, Wollschlager and Fentura entered into an Amended and Restated Supplemental Executive Retirement Agreement ("Amended SERP"), which increased his lump sum payment from $175,000 to $245,000 if the Bank terminated him without cause. This Amended SERP rescinded and replaced the original SERP Agreement.

Fentura and Wollschlager agreed that Wollschlager would resign from the Bank effective September 20, 2011. Fentura and Wollschlager entered into a Separation Agreement. In the Separation Agreement, Fentura and Wollschlager stipulated that Wollschlager was not being terminated for cause, and that his resignation would be treated as an "early retirement." The Separation Agreement contained the following payment provisions: (i) Wollschlager was entitled to receive the $245,000 lump sum payment provided for in the Amended SERP; (ii) a portion of this lump sum payment - $137,749 – was to be paid within 60 days of Wollschlager's separation date; this amount was equivalent to one year of his base compensation; (iii) the remainder of the lump sum payment - $107,251 – was to be paid within 30 days after Fentura and the Bank were informed by their respective regulators

that they were no longer in troubled condition; and (iv) in addition to the lump sum payment, Wollschlager would receive a separation payment in the amount of $28,062.36 within 30 days after Fentura and the Bank were informed by their respective regulators that they were no longer in troubled condition. The parties agree that these payments are considered "golden parachute payments" under 12 C.F.R. Part 359.

In September 2011, in accordance with the Separation Agreement, Fentura sought approval from the FRB and the FDIC to make the first golden parachute payment to Wollschlager in the amount of $137,449. Fentura advised the FDIC that over the course of Wollschlager's three-year employment with the Bank, he was instrumental in improving the asset quality problems that led to the regulatory action. On September 26, 2012, the FRB approved the request, and cautioned that any additional applications for approval of payments to Wollschlager would be considered against the FDIC Financial Institution Letter 66-2010 ("FIL 66-2010"), which provides in pertinent part that, as a general proposition, the FDIC's Golden Parachute Regulations "should not be viewed as intended to permit golden parachute payments in excess of 12 months' salary." FIL 66-2010 at 8. The parties agree that this first golden parachute payment was equal to one year of Wollschlager's salary.

The FDIC concurred in the FRB's approval of the first golden parachute payment on October 17, 2012. On October 26, 2012, Fentura paid Wollschlager $104,800.39 ($137,749 less tax withholdings).

On March 22, 2013, the Bank's Consent Order with the FDIC was terminated, and the institution no longer was designated as troubled. The FRB terminated Fentura's written agreement on July 31, 2013; at that point, it was no longer considered to be in troubled condition.

In December 2013, Fentura sought approval for the second golden parachute payment in the amount of $135,313.36. This payment represents the balance of the Amended SERP Agreement – $107,251 – and the payment under the Separation Agreement – $28,062.36. If approved, Wollschlager would receive two golden parachute payments totaling $273,062.36.

In its application, Fentura wrote in pertinent part:

> Fentura and the Bank believe the approval of the Payment is warranted. Although it is acknowledged that the Amended SERP Agreement and the Separation Agreement required prior approval pursuant to the Golden Parachute Restrictions, the Separation Agreement did provide that no payments would be made to Mr. Wollschlager without prior regulatory approval. As noted in the Federal Reserve Approval, regulatory approval would be required to make the remainder of the SERP Payment and/or the Separation Payment.

6

> The Federal Reserve Approval also notes that any payments to Mr. Wollschlager would be governed by the provisions of the FDIC Financial Institution Letter 66-2010, issued October 14, 2010 which provides that as a general proposition, the Golden Parachute Restrictions "should not be viewed as being intended to permit golden parachute payments in excess of 12 months' salary." Although any additional payments to Mr. Wollschlager would exceed his one year salary that he has already received, Fentura and the Bank believe that such additional payments are justified. It was the belief of the boards of directors and Fentura and the Bank and their compensation committees that the amounts of the SERP Payment and the Separation Payment being offered to Mr. Wollschlager were benefits competitive with other institutions of similar size and not extraordinary amounts. In addition, litigation by Mr. Wollschlager regarding his termination was a concern to Fentura and the Bank.

AR0110, [ECF No. 16-7, PageID.240].

The FRB approved Fentura's second golden parachute payment. The FDIC declined to concur with the FRB's approval. In declining, the FDIC relied on its guidance establishing that, as a general proposition, the agency will not authorize golden parachute payments exceeding one year's salary. The FDIC found that the circumstances did not warrant departing from this general rule. Specifically, the FDIC found: (1) the second golden parachute payment was unreasonable, "given the troubled condition of the Bank, services rendered by [Wollschlager], and the amount of time of his

7

employment" AR0240, [ECF No. 18-4, PageID.445]; and (2) the Amended SERP Agreement and the Separation Agreement were never submitted for regulatory approval as required by Part 359. *Id.*

Wollschlager filed this action seeking review of the FDIC's denial of concurrence of the FRB's decision to approve his second golden parachute payment in the amount of $135,313.36.

## IV. STANDARD OF REVIEW

On a motion for judgment on the administrative record, the summary judgment standard under Fed. R. Civ. P. 56 does not apply; the Court is limited to reviewing the administrative record. *Vaught v. Federal Deposit Insurance Corporation,* 2018 WL 5098531 at *6 (slip op. Apr. 4, 2018, E.D. Tenn) (quoting *N.C. Fisheries Ass'n, Inc. v. Gutierrez,* 518 F. Supp. 2d 62, 79 (D.D.C. 2007)). The Court must "'determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Id.* (quoting *Sierra Club v. Mainella,* 459 F. Supp. 2d 76, 90 (D.D.C. 2006)).

Under the Administrative Procedure Act ("APA"), "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. The APA directs courts to review

agency actions under a deferential standard. *Bangura v. Hansen,* 434 F.3d 487, 502 (6th Cir. 2006). A court may set aside an agency's action under the APA only if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The reviewing court must ensure the agency has examined relevant data and articulated a satisfactory explanation for its action. *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 513-14 (2009) (quoting *Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). The court should not substitute its judgment for the judgment of the agency and must uphold an agency decision "of less than ideal clarity if the agency's path may reasonably be discerned." *Fox Television,* 556 U.S. at 513-14 (quoting *Bowman Transp., Inc. v. Arkansas-Best Frieght Sys., Inc.,* 419 U.S. 281, 286 (1974)).

**V.  ANALYSIS**

Wollschlager makes several arguments in his Complaint that he abandons in briefing. In his Complaint, Wollschlager alleges the FDIC's denial of his second golden parachute payment is arbitrary, capricious, and an abuse of discretion because: (1) the FDIC no longer classifies the Bank as a troubled institution; (2) the Board of Governors of the Federal Reserve already approved the first golden parachute payment to Wollschlager; (3) the

SERP Agreement and Amended SERP Agreement constitute a bona fide deferred compensation plan under 12 U.S.C. § 1828(k)(4)(C) and 12 C.F.R. 359.1, and therefore are not golden parachute payments; (4) the FDIC's decision is outside the scope of authority prescribed in 12 U.S.C. § 1828(k), 12 C.F.R. 359.4 and 60 Federal Register 16069-16073; (5) the FDIC's denial is based on total payments to Wollschlager exceeding 12 months salary, but that provision of 12 C.F.R. 359.4(a)(3) applies only in the event of a change in control of the Bank, and no such change of the Bank, and no such change of control occurred; and (6) to the extent the FDIC relied on 12 C.F.R. 359.4(b) to deny Wollschlager's second golden parachute payment, its determination was arbitrary, capricious, and an abuse of discretion because Wollschlager's efforts over his three years of employment were successful in improving the Bank's asset quality problems and removing its troubled institution designation.

Now, the following conclusions are uncontested: (1) the proposed second payment is a golden parachute payment; (2) the Amended SERP is a golden parachute payment; (3) the SERP and the Amended SERP are not bona fide deferred compensation plans; and (4) the FDIC reasonably approved the first requested payment.

10

Wollschalger says the only issue is whether the FDIC arbitrarily, capriciously, and contrary to law, ignored its own regulations and regulatory guidance by failing to consider Wollschlager a "white knight" under 12 C.F.R. § 359.4(a)(2), and by failing to approve the second requested payment to him on that basis. Wollschlager also makes an equitable argument that the FDIC waived any argument that the second payment is prohibited because it concurred in the FRB's approval of the first golden parachute payment.

The FDIC says it: (1) properly evaluated Fentura's golden parachute application under the Regulator's Concurrence Exception because no other exception applied; and (2) Wollschlager's equitable arguments lack merit.

The Court first addresses the White Knight Exception, and then Wollschlager's equitable arguments.

### A. The White Knight Exception

The FDIC allows golden parachute payments under three exceptions: the (1) Regulator's Concurrence Exception under 12 C.F.R. § 359.4(a)(1); (2) White Knight Exception under 12 C.F.R. § 359.4(a)(2); and (3) Changes in Control Exception under 12 C.F.R. § 359.4(a)(3). Wollschlager says the FDIC failed to evaluate him under the White Knight Exception, and instead, incorrectly evaluated him under the Regulator's Concurrence Exception.

The FDIC says the White Knight Exception does not apply for two reasons: (1) the parties did not obtain the FDIC's written authorization before entering into the Amended SERP Agreement and the Separation Agreement; and (2) the White Knight Exception, by its terms, does not apply to Wollschlager.

Wollschlager says: (1) the FDIC misinterprets 12 C.F.R. § 359.4(a)(2), because it does not require prior approval before the agreements are signed; and (2) even if it did require prior approval, though the Amended SERP and Separation Agreements were entered after Wollschlager became a Bank employee, the Amended SERP is an amendment of the original SERP Agreement – that Wollschlager entered into before employment – and stems from that agreement, as does the Separation Agreement.

### 1. Whether Agreements Invoking the White Knight Exception Require Prior Regulatory Approval

The parties agree that the White Knight Exception was intended to allow struggling banks to offer turnaround specialists, compensation packages that would induce them to accept employment at institutions that may not survive. Under the White Knight Exception, an insured depository institution or depository institution holding company may agree to make or may make a golden parachute payment if and to the extent that:

> Such an agreement is made in order to hire a person to become an [institution affiliated party] either at the time when the insured depository institution or depository institution holding company satisfies or in an effort to prevent it from imminently satisfying any of the criteria set forth in § 359.1(f)(1)(ii), and the institution's appropriate federal banking agency and the Corporation consent in writing to the amount and terms of the golden parachute payment. Such consent by the FDIC and the institution's appropriate federal banking agency shall not improve the [institution affiliated party's] position in the event of the insolvency of the institution since such consent can neither bind a receiver nor affect the provability of receivership claims. In the event that the institution is placed into receivership or conservatorship, the FDIC and/or the institution's appropriate federal banking agency shall not be obligated to pay the promised golden parachute and the [institution affiliated party] shall not be accorded preferential treatment on the basis of such prior approval.

12 C.F.R. § 359.4(a)(2).

Wollschlager says he is a classic example of a White Knight – he took the calculated risk to accept employment with the Bank rather than accept other, more favorable, bank employment offers, or return to his consultant profession where he earned in excess of $250,000 annually. But the FDIC says the White Knight Exception cannot apply to Wollschlager because neither Fentura, the Bank, nor Wollschlager obtained the FDIC's written consent prior to entering into the Separation Agreement or the Amended SERP. In fact, the agreements were entered into two years after the Bank

13

hired Wollschlager. Specifically, the FDIC cites the first sentence of the applicable subsection: "[s]uch an agreement is made in order to hire a person to become an [institution affiliated party]."

Wollschlager says 12 C.F.R. § 359.4(a)(2) does not precondition the White Knight Exception on the written consent of the FDIC to enter into agreements. Instead, he says it requires that the institution's appropriate federal banking agency and the Corporation "consent in writing to the amount and terms of the golden parachute payment." Wollschlager says the language of the applicable subsection permits Fentura to agree to make or make a golden parachute payment as long as written consent is obtained for the amount and terms of the payment.

When the Court engages in statutory interpretation, the first step is to "examine the language of the statute and determine if its meaning is plain." *NNDJ, Inc. v. Comerica Inc.,* 584 F.Supp.2d 957, 960 (E.D. Mich. Oct. 21, 2008) (internal citations omitted). To make this determination, "the court looks at the language and design of the statute as a whole and makes an effort not to interpret provisions in such a manner as to render other provisions of the same statute inconsistent, meaningless or superfluous." *Id.*

The Court finds the plain language of the statute preconditions the White Knight Exception on the written consent of the FDIC to enter into such

14

agreements. Wollschlager says the FDIC fails to provide any case law to support their argument, but neither does he.

Wollschlager attempts to convince the Court that the last sentence of the regulation refers to approval of a White Knight agreement "at an earlier point in time but is silent as to when." This is illogical. The first sentence of the statute is plain: "[s]uch an agreement is made *in order to hire* a person." Wollschlager entered into the Amended SERP and Separation Agreements years after the Bank hired him.

Wollschlager makes the alternative argument that: he accepted the Bank's employment offer on October 14, 2008, and the original SERP plan was adopted as of October 24, 2008. He says that although the Amended SERP agreement and the Separation Agreement were agreed upon after Wollschlager was hired, the Amended SERP is an amendment of the original SERP Agreement and stems from it, as does the Separation Agreement. This adds nothing to his argument. Wollschlager does not address that the Amended SERP Agreement "rescinded and replaced" the original SERP Agreement, and regardless, neither the FDIC nor the FRB approved the original SERP Agreement.

Given this interpretation, the Court finds that the FDIC's failure to consider the White Knight exception was a decision that cannot be

15

considered "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### 2. The FDIC's Failure to Evaluate Wollschlager Under the White Knight Exception

Wollschlager says the FDIC failed to evaluate all of the decisional factors of 12 C.F.R. § 359.4; specifically, it never evaluated whether Wollschlager was considered a White Knight.

The FDIC acknowledges that it did not refer to the White Knight Exception by name in its denial of Wollschlager's second payment, but says this omission – assuming it was an error – was harmless for two reasons: (1) the exception does not apply as a matter of law because Wollschlager was already a Bank employee at the time the agreements were entered into; and (2) applying Part 359.4(b)'s discretionary factors, the FDIC determined that a maximum of one year's severance was reasonable.

Because the Court finds that White Knight agreements require the FDIC's approval, the Court need not address this. The FDIC's failure to evaluate Wollschlager under this exception is harmless, given the failure of Fentura and the Bank to obtain approval before entering into an agreement with Wollschlager.

**B. Wollschlager's Equitable Arguments Against the FDIC**

Wollschlager makes several equitable arguments: (1) the Bank and Fentura openly communicated for years with the FDIC and the FRB about the agreements and about their intent to pay Wollschlager according to those agreements if the FDIC and FRB approved them; (2) the FDIC waived its argument that it could not consider Wollschlager as a White Knight on the basis that the agreements did not have prior approval because it approved Wollschlager's first payment despite the Bank and Fentura following their same procedure of entering into the agreements and then submitting them to the FDIC and FRB for approval and payment. In his reply brief, Wollschlager also says the FDIC affirmatively misled Wollschlager when it approved the first golden parachute payment.

The FDIC says: (1) Wollschlager fails to cite any case law where an agency was found to have waived its authority to enforce a federal statute; and (2) there is a strong public interest in preventing struggling financial institutions from squandering their assets on payments to departing executives.

Because the Court finds White Knight agreements require prior approval, and that the FDIC's failure to evaluate Wollschlager under the

White Knight exception was reasonable because of Fentura and the Bank's failure to obtain approval before entering into the agreements with Wollschlager, the Court will not consider Wollschlager's equitable arguments. Instead, the Court finds the FDIC's denial of the concurrence is reasonable based on its regulatory guidance that golden parachute payments will generally not exceed the equivalent of one year's salary. 12 C.F.R. § 359.4(a)(3). ("Such a payment is made pursuant to an agreement which provides for a reasonable severance payment, not to exceed twelve months salary"). Further, Fentura and the Bank's correspondence with the FRB and FDIC repeatedly acknowledge this regulatory guidance and that Wollschlager's first golden parachute payment is equivalent to one year's salary.

## VI. CONCLUSION

The Court **GRANTS** the FDIC's Motion for Judgment on the Administrative Record [ECF No. 22] and **DENIES** Wollschlager's Memorandum for Review of the FDIC's Decision [ECF No. 21].

**IT IS ORDERED.**

Date: May 14, 2020              s/ Victoria A. Roberts
                                Victoria A. Roberts
                                United States District Judge